No. 20-55437

# In the
# United States Court of Appeals
# for the Ninth Circuit

◆

**KIM RHODE, et al.,**

*Plaintiffs-Appellees,*

v.

**XAVIER BECERRA, in his official capacity as
Attorney General of the State of California,**

*Defendant-Appellant.*

◆

On Appeal from the United States District Court
for the Southern District of California
Case No. 3:18-cv-00802-BEN-JLB

◆

**BRIEF OF *AMICI CURIAE* FIREARMS POLICY COALITION,
FIREARMS POLICY FOUNDATION, CALIFORNIA GUN
RIGHTS FOUNDATION, MADISON SOCIETY FOUNDATION,
AND SECOND AMENDMENT FOUNDATION IN SUPPORT
OF APPELLEES AND AFFIRMANCE**

◆

JOSEPH G.S. GREENLEE
FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 378-5785
jgr@fpchq.org
*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici Curiae* make the following statements:

**Firearms Policy Coalition** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**Firearms Policy Foundation** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**California Gun Rights Foundation** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**Madison Society Foundation** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**Second Amendment Foundation** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

/s/ *Joseph G.S. Greenlee*
*Counsel of Record*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES .................................................... iii

STATEMENT OF INTEREST ................................................. 1

CONSENT TO FILE ........................................................ 2

SUMMARY OF ARGUMENT ................................................. 3

ARGUMENT .............................................................. 5

   I.   Ammunition is protected by the Second Amendment. ................... 5

   II.   Ammunition background checks are not "presumptively lawful." ............................................................. 6

   III. California's ammunition scheme cannot survive intermediate scrutiny.............................................................. 12

      A.   The State must provide substantial evidence and cannot rely on shoddy reasoning or data. .............................. 13

      B.   The State must prove that the objective is achieved more effectively through the regulation. ........................... 16

      C.   The State must overcome the plaintiffs' rebuttal evidence. ...... 17

      D.   The State may not suppress the secondary effects of ammunition ownership by suppressing ammunition ownership itself........................................................ 19

      E.   The State must consider substantially less burdensome alternatives. ................................................. 22

   IV. California's ammunition scheme cannot survive the "simple *Heller* test." ...................................................... 25

CONCLUSION .......................................................... 27

CERTIFICATE OF COMPLIANCE........................................ 29

CERTIFICATE OF SERVICE............................................. 30

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart, Inc. v. Rhode Island*,
  517 U.S. 484 (1996) ............................................................... 13, 14, 15

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*,
  910 F.3d 106 (3d Cir. 2018) ................................................................ 23

*Bd. of Trustees of State Univ. of New York v. Fox*,
  492 U.S. 469 (1989) ........................................................................... 12

*Billups v. City of Charleston, S.C.*,
  961 F.3d 673 (4th Cir. 2020) .............................................................. 24

*Bonidy v. U.S. Postal Serv.*,
  790 F.3d 1121 (10th Cir. 2015) .......................................................... 23

*Caetano v. Massachusetts*,
  136 S. Ct. 1027 (2016) ....................................................................... 26

*City of Los Angeles v. Alameda Books, Inc.*,
  535 U.S. 425 (2002) ......................................................... 13, 17, 19, 20

*City of Renton v. Playtime Theatres, Inc.*,
  475 U.S. 41 (1986) ............................................................................. 13

*DISH Network Corp. v. F.C.C.*,
  653 F.3d 771 (9th Cir. 2011) ................................................................ 7

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................................... *passim*

*Duncan v. Becerra*,
  742 F. App'x 218 (9th Cir. 2018) ........................................... 5, 6, 25, 27

*Edenfield v. Fane*,
  507 U.S. 761 (1993) ......................................................... 13, 14, 15, 17

*Ezell v. City of Chicago,*
   651 F.3d 684 (7th Cir. 2011) ("*Ezell I*") ..............................23

*Ezell v. City of Chicago,*
   846 F.3d 888 (7th Cir. 2017) ("*Ezell II*").............................16

*Friedman v. City of Highland Park, Ill.,*
   136 S. Ct. 447 (2015).......................................................26

*Frisby v. Schultz,*
   487 U.S. 474 (1988).........................................................22

*Fyock v. Sunnyvale,*
   779 F.3d 991 (9th Cir. 2015) ...............................................5

*Heller v. District of Columbia,*
   670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") ........................15

*Heller v. District of Columbia,*
   801 F.3d 264 (D.C. Cir. 2015) ("*Heller III*")...................20, 23

*Jackson v. City & Cty. of San Francisco,*
   746 F.3d 953 (9th Cir. 2014) ....................................5, 6, 7, 12

*Marks v. United States,*
   430 U.S. 188 (1977)........................................................20

*McCullen v. Coakley,*
   134 S. Ct. 2518 (2014)................................................23, 24

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) .....................................................7, 26

*Moore v. Madigan,*
   702 F.3d 933 (7th Cir. 2012) ............................................23

*Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cty., Fla.,*
   630 F.3d 1346 (11th Cir. 2011) .........................................20

*Reynolds v. Middleton,*
   779 F.3d 222 (4th Cir. 2015) ............................................24

iv

*Rhode v. Becerra,*
  No. 18-CV-802-BEN, 2020 WL 2392655 (S.D. Cal. Apr. 23, 2020)
  ..................................................................................... *passim*

*Silvester v. Harris,*
  843 F.3d 816 (9th Cir. 2016) ........................................................ 7, 11

*Sports Form, Inc. v. United Press Int'l, Inc.,*
  686 F.2d 750 (9th Cir. 1982) .............................................................. 7

*Teixeira v. Cty. of Alameda,*
  873 F.3d 670 (9th Cir. 2017) (en banc) .............................................. 7

*Thalheimer v. City of San Diego,*
  645 F.3d 1109 (9th Cir. 2011) ............................................................ 5

*Turner Broad. Sys. v. F.C.C.,*
  512 U.S. 622 (1994) ("*Turner I*") ......................................... 13, 14, 16

*Turner Broad. Sys. v. F.C.C.,*
  520 U.S. 180 (1997) ("*Turner II*") ............................................ 13, 14

*United States v. Chester,*
  628 F.3d 673 (4th Cir. 2010) ............................................................ 17

*United States v. Chovan,*
  735 F.3d 1127 (9th Cir. 2013) ..................................................... 8, 9, 11

*United States v. Flores,*
  663 F.3d 1022 (8th Cir. 2011) ............................................................ 9

*United States v. Hinkson,*
  585 F.3d 1247 (9th Cir. 2009) (en banc) .......................................... 25

*United States v. Huitron-Guizar,*
  678 F.3d 1164 (10th Cir. 2012) .......................................................... 9

*United States v. Marzzarella,*
  614 F.3d 85 (3d Cir. 2010) ......................................................... 10, 11

*United States v. Meza-Rodriguez,*
  798 F.3d 664 (7th Cir. 2015) .............................................................. 9

*United States v. Portillo-Munoz,*
  643 F.3d 437 (5th Cir. 2011) ................................................................9

*United States v. Reese,*
  627 F.3d 792 (10th Cir. 2010) ..........................................................23

*United States v. Torres,*
  911 F.3d 1253 (9th Cir. 2019) ............................................................9

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ..................................................................16, 22

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,*
  471 U.S. 626 (1985) ............................................................................12

## Statutes and Regulations

18 U.S.C. § 922(g)(9) ............................................................................8, 17

18 U.S.C. § 922(k) ....................................................................................10

Cal. Code Regs. tit. 11, § 4302 ..............................................................22

## Other Authorities

SHORTER OXFORD ENGLISH DICTIONARY (1993) ..........................................8

## STATEMENT OF INTEREST

**Firearms Policy Coalition ("FPC")** is a nonprofit organization that defends and advances freedom and individual liberties—including the fundamental right to keep and bear arms—and promotes sound, principled, and constitutionally based public policy. FPC accomplishes its mission through research, education, and legal programs, among others. Since its founding, FPC has emerged as a leading advocate for individual liberty in state and federal courts, regularly participating as a party or *amicus*. FPC is party to several cases before this Court and within its jurisdiction and has filed *amicus* briefs in many recent Second Amendment cases, including *Duncan v. Becerra*, *Rupp v. Becerra*, *United States v. Torres*, and *Young v. Hawaii*. FPC respectfully believes that its substantial experience and expertise in the Second Amendment field would aid the Court.

**Firearms Policy Foundation** is a nonprofit organization that serves its members and the public through charitable programs including research, education, and legal efforts, with a focus on constitutional rights.

1

**California Gun Rights Foundation** is a nonprofit organization dedicated to defending the constitutional rights of California gun owners and educating the public about federal, state, and local laws.

**Madison Society Foundation ("MSF")** is a nonprofit corporation based in California. MSF seeks to promote and preserve the right to keep and bear arms by offering education and training to the public.

**Second Amendment Foundation ("SAF")** is a nonprofit foundation dedicated to protecting the right to arms through educational and legal action programs. SAF has over 650,000 members, in every State of the Union. SAF organized and prevailed in *McDonald v. City of Chicago*.

This case concerns *amici* because it directly impacts their members' ability to acquire ammunition and exercise their right to keep and bear arms in California.

## CONSENT TO FILE

All parties have consented to the filing of this brief.[1]

---

[1] No counsel for a party authored this brief in whole or in part. No party or counsel contributed money intended to fund the preparation or submission of this brief. No person other than *amici* and their members contributed money intended to fund the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

California has enacted the country's first background check requirement for every ammunition purchase. The State's background check scheme is complex, deficient, and ineffective. It burdens every lawful purchaser—often requiring two trips to the store—and because of its many defects, it refuses roughly 16 percent of lawful purchases.

The background check system is ineffective even when it operates as intended. The State has offered no evidence demonstrating that it can reasonably be expected to prevent gun violence. Rather, the State offered a mere three studies—two on record-keeping and of little relevance, and a third showing that several alternatives exist to background checks that are more effective and less burdensome.

To avoid Second Amendment scrutiny, the State argues that its ammunition scheme is a "presumptively lawful" regulation. This Court has already held that ammunition regulations are not "presumptively lawful." Moreover, to be "presumptively lawful," the regulation must be "longstanding" and have a "historical justification"—the State's first-of-its-kind law from 2019 is neither longstanding nor historically justified.

3

Because it is not "presumptively lawful," under this Court's precedents the background check law must be subject to some form of heightened scrutiny. It fails even intermediate scrutiny—the most lenient level of scrutiny available. Intermediate scrutiny requires that the State: (1) produce substantial evidence; (2) prove that the government objective is achieved more effectively through the regulation; (3) overcome rebuttal evidence; (4) refrain from suppressing the protected conduct in the same proportion as secondary effects; and (5) consider substantially less burdensome alternatives. The State failed to satisfy each of these elements.

If the ammunition scheme is considered a prohibition on ammunition—as it has been for tens of thousands of Californians—it is categorically unconstitutional under what the district court deemed the "simple *Heller* test." Regardless of which test is most appropriate, because the district court correctly determined that the background check law is unconstitutional under both, it did not abuse its discretion.

4

## ARGUMENT

This Court "review[s] a district court's decision to grant or deny a preliminary injunction for abuse of discretion." *Duncan v. Becerra*, 742 F. App'x 218, 220 (9th Cir. 2018) (quoting *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011)). Rather than "determine the ultimate merits," this Court determines "only whether the district court correctly distilled the applicable rules of law and exercised permissible discretion in applying those rules to the facts at hand." *Id.* (quoting *Fyock v. Sunnyvale*, 779 F.3d 991, 995 (9th Cir. 2015)).

## I. Ammunition is protected by the Second Amendment.

The district court did not abuse its discretion by concluding that ammunition is protected by the Second Amendment. *Rhode v. Becerra*, No. 18-CV-802-BEN, 2020 WL 2392655, at \*12 (S.D. Cal. Apr. 23, 2020).

This Court previously held that "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (quotation marks omitted). Because the Supreme Court in *District of Columbia v. Heller* "considered the burden certain gunpowder-storage laws imposed on the Second Amendment right," and

5

because "without bullets, the right to bear arms would be meaningless," ammunition restrictions "regulate[] conduct within the scope of the Second Amendment." *Jackson*, 746 F.3d at 967, 968 (citing *District of Columbia v. Heller*, 554 U.S. 570, 632 (2008)).

Indeed, this Court recently upheld a preliminary injunction enjoining California's prohibition on certain firearm magazines because "the ammunition for a weapon is similar to the magazine for a weapon." *Duncan*, 742 F. App'x at 221 (citing *Jackson*, 746 F.3d at 967).

The precedents of this Court and the Supreme Court certify that the Second Amendment protects ammunition.

## II.  Ammunition background checks are not "presumptively lawful."

The State claims that its ammunition scheme is a "presumptively lawful" regulation. Op. Br. at 34–36. This Court has definitively rejected this claim: "Conducting our historical review, we conclude that . . . *Heller* does not include ammunition regulations in the list of 'presumptively lawful' regulations."[2] *Jackson*, 746 F.3d at 968; *see also Teixeira v. Cty. of*

---

[2] The examples *Heller* provided were "prohibitions on the possession of firearms by felons and the mentally ill, . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings,

*Alameda*, 873 F.3d 670, 676–77 (9th Cir. 2017) (en banc) ("We held in *Jackson* that a prohibition on the sale of certain types of ammunition burdened the core second amendment right and so was subject to heightened scrutiny."). The district court followed binding precedent in rejecting the State's presumptively lawful argument; it did not abuse its discretion. *Rhode*, 2020 WL at *16–17; *see DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011) (quoting *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 752 (9th Cir. 1982)) (abuse of discretion requires "clear error of judgment").

Moreover, to be "presumptively lawful," a regulation must be "longstanding" with "historical justifications." *Heller*, 554 U.S. at 626–27 & n.26, 635 (providing a list of "longstanding" regulations that are "presumptively lawful" and promising to "expound upon the historical justifications for the exceptions . . . when those exceptions come before us"); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (repeating *Heller*'s "longstanding regulatory measures"); *Silvester v. Harris*, 843 F.3d 816, 820 (9th Cir. 2016) ("The Court also recognized that the Second

---

[and] laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 627.

Amendment does not preclude certain 'longstanding' provisions, which it termed 'presumptively lawful regulatory measures'") (quoting *Heller*, 554 U.S. at 626–27, 627 n.26).

California's ammunition scheme, which took effect in 2019, is the first of its kind. "[A] background check required each time ammunition is purchased has never been implemented before." *Rhode*, 2020 WL at *17. Something that is "longstanding" has two characteristics: being "long" and being "standing." *See* 1 SHORTER OXFORD ENGLISH DICTIONARY 1625 (1993) ("adj. Of long standing; that has existed a long time, not recent."). The law is thus not longstanding.

The State offers no historical justification or evidence of longstanding. Instead, the State argues that "[b]ecause these laws are direct means of enforcing the 'presumptively lawful' bans that a State may adopt under *Heller*, they too are presumptively lawful." Op Br. at 36.

Neither this Court nor any sister circuit has adopted the State's interpretation. This Court requires that the challenged law itself satisfy *Heller*'s "presumptively lawful" criteria. Having some relation to a "presumptively lawful" regulation is insufficient. In *United States v. Chovan*, "[t]he government argue[d] that [18 U.S.C.] § 922(g)(9) is a

8

presumptively lawful regulatory measure" because it "is part of a long line of prohibitions and restrictions on the right to possess firearms by people perceived as dangerous or violent." 735 F.3d 1127, 1137 (9th Cir. 2013) (quotations omitted). This Court rejected that argument:

> We do not agree. First, it is not clear that such prohibitions are so longstanding. The first federal firearm restrictions regarding violent offenders were not passed until 1938, as part of the Federal Firearms Act. Second, and more importantly, the government has not proved that *domestic violence misdemeanants* in particular have historically been restricted from bearing arms.

*Id.* (citation omitted) (emphasis in original).

In addition to enforcing "presumptively lawful" bans on felons and the mentally ill, the State's ammunition scheme enforces bans—like those on domestic violence misdemeanants and undocumented aliens—that are *not* "presumptively lawful."[3] The State's interpretation would extend presumptive validity to any law that included "presumptively lawful"

---

[3] No circuit has held that firearm bans on undocumented aliens are "presumptively lawful." *See United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011); *United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015); *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011); *United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019); *United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012). And, as noted, this Court held that bans on domestic violence misdemeanants are not "presumptively lawful" in *Chovan*.

regulations in its scope. This would allow *Heller*'s "presumptively lawful" dictum to swallow its holding. For example, a complete ban on firearm possession would be "presumptively lawful" if the government's interests included preventing firearm possession by felons and the mentally ill. And a complete ban on bearing arms would be "presumptively lawful" as long as it applied in sensitive places such as schools and government buildings in addition to everywhere else. This cannot be what the *Heller* Court intended, or the District of Columbia's handgun ban itself would have been "presumptively lawful."

The Third Circuit declined to adopt the State's interpretation in *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010). In *Marzzarella*, the district court had "held that because [18 U.S.C.] § 922(k) is designed to regulate the commercial sale of firearms and to prevent possession by a class of presumptively dangerous individuals, it is analogous to several longstanding limitations on the right to bear arms identified as presumptively valid in *Heller*." *Id.* at 88. The Third Circuit, instead, adopted an approach "consistent with the historical approach *Heller* used" in which "[c]ommercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment," meaning "a court

10

necessarily must examine the nature and extent of the imposed condition." *Id.* at 91, 92 n.8. This Court followed *Marzzarella* by adopting its two-part test for Second Amendment challenges. *Chovan*, 735 F.3d at 1136 ("We adopt the two-step Second Amendment inquiry undertaken by the Third Circuit in *Marzzarella*").

"In the alternative," the State argues that "these laws impose presumptively lawful conditions and qualifications on the commercial sale of arms." Op. Br. at 36. But again, only *longstanding* conditions and qualifications on the commercial sale of arms are presumptively lawful. *Chovan*, 735 F.3d at 1137; *Silvester*, 843 F.3d at 820. And the State conceded that "no other State has implemented similar requirements" to its 2019 ammunition scheme. Op. Br. at 42.

Without the longstanding element, there would be a categorical exception for regulations on commercial sales. "If there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*." *Marzzarella*, 614 F.3d at 92 n.8.

11

The district court did not abuse its discretion by faithfully applying this Court's precedents.

## III. California's ammunition scheme cannot survive intermediate scrutiny.

The State correctly recognized that, because *Heller* ruled out rational basis review, intermediate scrutiny is the most lenient test available under this Court's precedents. Op. Br. at 37. *See e.g.*, *Jackson*, 746 F.3d at 960 ("While *Heller* did not specify the appropriate level of scrutiny for Second Amendment claims, it nevertheless confirmed that rational basis review is not appropriate.").

To satisfy intermediate scrutiny, "the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit." *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989) (citing *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 647 (1985)).

Specifically, the Supreme Court has developed an intermediate scrutiny doctrine that requires the State to: (1) produce substantial evidence; (2) prove that the government objective is achieved more effectively through the regulation; (3) overcome rebuttal evidence; (4) refrain from suppressing the protected conduct in the same proportion as

12

secondary effects; and (5) consider substantially less burdensome alternatives. The State did not satisfy any of these elements.

### A. The State must provide substantial evidence and cannot rely on shoddy reasoning or data.

Under intermediate scrutiny, "the [government] bears the burden of showing not merely that its regulation will advance its interest, but also that it will do so 'to a material degree.'" *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996) (quoting *Edenfield v. Fane*, 507 U.S. 761, 771 (1993)). "This burden is not satisfied by mere speculation or conjecture." *Edenfield*, 507 U.S. at 770. The government cannot "get away with shoddy data or reasoning." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002). Rather, the government "must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them." *Edenfield*, 507 U.S. at 771. The demonstration must be based on "substantial evidence." *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 666 (1994) ("*Turner I*"); *Turner Broad. Sys. v. F.C.C.*, 520 U.S. 180, 195 (1997) ("*Turner II*").

In *City of Renton v. Playtime Theatres, Inc.*, the Supreme Court upheld a zoning ordinance where the record contained "substantial evidence" that led to "detailed findings," based on "a long period of study and

13

discussion," as well as "extensive testimony." 475 U.S. 41, 51 (1986) (citation omitted). *Turner II* was heard after the Court remanded *Turner I* for 18 months of additional factfinding. The *Turner II* Court determined that the record supported Congress's predictive judgments where it included "[e]xtensive testimony," "volumes of documentary evidence and studies," and "extensive anecdotal evidence." *Id.* at 198, 199, 202.

By comparison, in *44 Liquormart, Inc.*, the government failed to justify a ban on price advertising for alcoholic beverages "without any findings of fact," 517 U.S. at 505, and in *Edenfield*, the Court struck down a ban on in-person solicitation by CPAs because the government "presents no studies" or "any anecdotal evidence." 507 U.S. at 771.

Here, "[t]he State's evidence is thin." *Rhode*, 2020 WL at *23. It provided "no studies of the effectiveness of pre-purchase, background checks for ammunition purchasers." *Id.* at *25.

The State provided two studies on ammunition *record-keeping*, one conducted in 2004 Los Angeles and the other in 2006 Sacramento, covering a period of only eight months, combined. ER 612, 624. Both studies found that roughly 3 percent of ammunition purchasers were prohibited persons, but neither demonstrated that background checks

14

would prevent gun violence. To the contrary, the Los Angeles study found that "prohibited purchasers seem likely to exploit alternative sources of ammunition such as unregulated private sellers operating in the secondary [criminal] firearms markets." ER 614.

A third study, from 2007 New Jersey, found that prohibited persons sometimes purchase ammunition. ER 641. But the report did not include a background check requirement in its nine recommendations for solving the problem, ER 667–72, and in the 13 years since the study, New Jersey has declined to implement such a law—perhaps reflecting a recognition that prohibited persons will acquire ammunition elsewhere.

Similar to the insufficient showings in *44 Liquormart* and *Edenfield*, the State offered no evidence that ammunition background checks reduce gun violence. Instead, the State provided three old studies unrelated to background checks. More evidence—*substantial evidence*—is needed to satisfy intermediate scrutiny. *See Heller v. District of Columbia*, 670 F.3d 1244, 1259 (D.C. Cir. 2011) ("*Heller II*") ("the District needs to present some meaningful evidence, not mere assertions, to justify its predictive judgments"); *Ezell v. City of Chicago*, 846 F.3d 888, 895 (7th Cir. 2017)

15

("*Ezell II*") (the government cannot "invoke [its] interests as a general matter and call it a day").

## B. The State must prove that the objective is achieved more effectively through the regulation.

The State "must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner I*, 512 U.S. at 664 (quotations omitted). The State must prove that "the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation." *Ward v. Rock Against Racism*, 491 U.S. 781, 782–83 (1989).

At most, the State's limited showing suggests that a problem exists. But the State has produced no evidence that its ammunition scheme would help. By relying on New Jersey's experience, which resulted in nine recommendations that did not include background checks, the State has revealed that its interest can indeed be achieved more effectively through other means—for example, recommendation #6 involves strengthening the penalties for illegal possession and transfers, which does not burden the rights of law-abiding citizens. Any suggestion that

16

the ammunition scheme is necessary to achieve the State's stated interest is thus based on "mere speculation" and "conjecture." *Edenfield*, 507 U.S. at 770–71. *See United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) ("The government has offered numerous plausible *reasons* why the disarmament of domestic violence misdemeanants is substantially related to an important government goal; however, it has not attempted to offer sufficient *evidence* to establish a substantial relationship between [18 U.S.C.] § 922(g)(9) and an important governmental goal").

**C. The State must overcome the plaintiffs' rebuttal evidence.**

Even if the State met its initial burden of providing evidence that "fairly support[s]" its rationale, the plaintiffs have an opportunity to "cast direct doubt on this rationale, either by demonstrating that the [government's] evidence does not support its rationale or by furnishing evidence that disputes the [government's] factual findings." *Alameda Books*, 535 U.S. at 438–39. "If plaintiffs succeed in casting doubt on a [government] rationale in either manner, the burden shifts back to the [government] to supplement the record with evidence renewing support for a theory that justifies its ordinance." *Id.* at 439.

17

The plaintiffs successfully cast doubt on the effectiveness of background checks by furnishing a 2018 University of Davis School of Medicine study on California's firearm background check system. ER 557. This study, *on background checks*, analyzed the firearm homicide and suicide rates during the ten years before and after its firearm background check law took effect and concluded that "the net difference during the 10 years postintervention was practically 0." ER 561. The study's California findings were consistent with findings from Indiana and Tennessee, where firearm background checks also had no positive effect on firearm homicide or suicide. *Id.*

The California background check study also highlights a contradiction in the State's position: If background checks are effective, why are California's firearm background checks not enough to prevent prohibited persons from committing firearm violence? If firearm background checks are ineffective, why would ammunition background checks fare better?

It cannot reasonably be expected that prohibited persons who circumvent the firearm background check law will be reluctant or unable to circumvent the ammunition background check law—especially considering that firearms are serialized, and thus traceable to their

original owners. The State's own evidence—the New Jersey study—reveals that straw purchasers likely pose a greater problem than commercial sales to prohibited persons. *See* ER 661 (then-U.S. Attorney Chris Christie testifying that "the straw purchaser aspect of the ammunition problem is enormous . . . . people who are just going in at the direction of members of gangs and buying incredible amounts of ammunition . . . tens of thousands of rounds of ammunition. . . .").

In response to plaintiffs' California background check study, the State offered "no conflicting legislative evidence supporting the efficacy of state-wide background checks," nor any other evidence demonstrating their effectiveness. *Rhode*, 2020 WL at *29. Therefore, even if the State met its initial burden, it failed to "supplement the record with evidence renewing support for a theory that justifies its ordinance." *Alameda Books*, at 439.

### D. The State may not suppress the secondary effects of ammunition ownership by suppressing ammunition ownership itself.

Under intermediate scrutiny, the government "may not regulate the secondary effects of [protected conduct] by suppressing the [protected

19

conduct] itself." *Alameda Books*, 535 U.S. at 445 (Kennedy, J.).[4] "The rationale of the ordinance must be that it will suppress secondary effects—and not by suppressing speech." *Id*. at 449–50.

The D.C. Circuit, consistent with *Alameda Books*, rejected the argument that "the most effective method of limiting misuse of firearms . . . is to limit the number of firearms present in the home." *Heller v. District of Columbia*, 801 F.3d 264, 280 (D.C. Cir. 2015) ("*Heller III*"). "[T]aken to its logical conclusion, that reasoning would justify a total ban on firearms kept in the home." *Id*.

Here, the law is aimed at the secondary effects of criminal misuse of ammunition. But the law burdens every citizen's constitutional rights. Each citizen must suffer the inconvenience of spending time and money to conduct the background check (which, even when the system functions as intended, often requires two trips to the store, *see Rhode*, 2020 WL at *9), in addition to the time and money required to acquire the necessary

---

[4] Justice Kennedy's opinion represents the holding in *Alameda Books*. *See e.g.*, *Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cty., Fla.*, 630 F.3d 1346, 1355 (11th Cir. 2011) ("because Justice Kennedy's concurrence reached the judgment on the narrowest grounds, his opinion represents the Supreme Court's holding in that case") (citing *Marks v. United States,* 430 U.S. 188, 193 (1977)).

documents. Meanwhile, over 16 percent of lawful purchasers are refused due to administrative errors or defects in the system, while only a fraction of one percent (less than 0.12 percent) of purchasers are potentially prohibited persons.[5] *Id.* at \*6; ER 251, 255. A policy that burdens so much lawful activity to prevent so little criminal activity is difficult to justify.

For those purchasers wrongfully refused, the ammunition scheme serves as a ban. While the State argues that roughly 40 percent of those rejected so far persevered and eventually succeeded in acquiring ammunition, Op. Br. at 41, the temporary ban constitutes irreparable injury, nevertheless. *See Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) ("the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). For the other roughly 60 percent, who are apparently still working their way through the ammunition scheme or ultimately gave up,[6] the scheme remains a

---

[5] Put differently, the law stops over 133.5 times more legitimate purchases than illegitimate ones.

[6] Upon rejection of the initial transaction, the rejected purchaser is not provided with a reason for the rejection, but only a "DROS number." E.R. 1245. The DROS number, which also serves as an Ammunition

complete ban (to say nothing of the countless citizens deterred by the scheme's complexity from even attempting to acquire ammunition). *See* E.R. 247–48. "A complete ban can be narrowly tailored but only if each activity within the proscription's scope is an appropriately targeted evil." *Ward*, 491 U.S. at 799–800 (quoting *Frisby v. Schultz,* 487 U.S. 474, 485 (1988)). The exercise of a constitutional right is not an appropriately targeted evil.

## E. The State must consider substantially less burdensome alternatives.

Under intermediate scrutiny, a court must ensure that "the means chosen are not substantially broader than necessary to achieve the government's interest." *Id.* at 800. While intermediate scrutiny does not demand the least restrictive means available, it does require the consideration of substantially less burdensome alternatives.

---

Transaction Number, allows the rejected purchaser "to obtain the reason for the rejection through the Department's CFARS website" (although she will likely know this only if the vendor informs her). Cal. Code Regs. tit. 11, § 4302. The rejected purchaser learns from the website only whether she was rejected because there was no record of her, or because the record of her does not match the information she provided to the vendor. ER 171–73. She may then start the process of creating a record or the process of correcting her information in the existing record. Neither of these is necessarily simple. *See* Ans. Br. at 9–11.

In the First Amendment context, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 134 S. Ct. 2518, 2540 (2014). In the Second Amendment context, Justice Breyer's intermediate scrutiny-like balancing test proposed in his *Heller* dissent considered "reasonable, but less restrictive, alternatives." *Heller*, 554 U.S. at 710 (Breyer, J., dissenting).

Several sister circuits have considered less burdensome alternatives in the Second Amendment context. *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106, 122, 124 n.28 (3d Cir. 2018); *Heller III*, 801 F.3d at 277–78; *Ezell v. City of Chicago*, 651 F.3d 684, 709 (7th Cir. 2011) ("*Ezell I*"); *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012); *United States v. Reese*, 627 F.3d 792, 803 (10th Cir. 2010); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1128 (10th Cir. 2015).

The Fourth Circuit recently explained its less-burdensome-requirement rule while applying intermediate scrutiny to a content-neutral speech restriction:

> the government must, inter alia, present evidence showing that — before enacting the speech-restricting law — it

23

"seriously undertook to address the problem with less intrusive tools readily available to it." *See McCullen*, 573 U.S. at 494, 134 S.Ct. 2518. In other words, the government is obliged to demonstrate that it actually tried or considered less-speech-restrictive alternatives and that such alternatives were inadequate to serve the government's interest. *Id.*; *see also* [*Reynolds v. Middleton*, 779 F.3d 222, 231–32 (4th Cir. 2015)]. The government's burden in this regard is satisfied only when it presents "actual evidence supporting its assertion[s]." *See Reynolds*, 779 F.3d at 229.

*Billups v. City of Charleston, S.C.*, 961 F.3d 673, 688 (4th Cir. 2020).

Here, the State provided no "actual evidence" that it "actually tried or considered" less restrictive alternatives. And the district court offered many examples:

> Could not the statute be tailored to permit purchase of a single box without a background check? Or could the statute require a background check only for purchasing quantities greater than 1,000 rounds? The experiment does not differentiate between purchasers of common types of home-defense 12 gauge shotgun shells or small .22 caliber plinking rounds and purchasers of particularly dangerous types of ammunition. Could not the statute differentiate between low-power, small rounds, and high-power unusual rounds? The experiment does not differentiate between a would-be purchaser who is an honorably discharged member of our military, a concealed carry permit holder, a hunter, or a former law enforcement officer, versus an edgy-looking, furtive-glancing, impatient and angry customer. Could not the state statute recognize that Federal Firearm License ammunition sellers have some discretion? The statute does not differentiate between residents living in high-density metropolitan areas with large, fast response police forces and residents living in rural areas with natural predators and few

24

> sheriff's deputies. Could not the statute offer some degree of tailoring to account for the ammunition needs arising from the vast differences between urban and rural life? Other California firearm statutes do so.

*Rhode*, 2020 WL at *22. The State has not demonstrated that these substantially less-burdensome alternatives would be inadequate. It has, therefore, not met the demands of intermediate scrutiny.

Because the State failed every tailoring element of intermediate scrutiny, the district court's holding cannot be considered "illogical, implausible, or without support in inferences that may be drawn from facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009) (en banc).

## IV. California's ammunition scheme cannot survive the "simple *Heller* test."

Because the State's ammunition scheme serves as a complete ban for tens of thousands of law-abiding citizens, the district court applied the "simple *Heller* test" in addition to intermediate scrutiny. This same two-test approach was approved in *Duncan*: "Although the district court applied two different tests, there is no reversible error if one of those tests follows the applicable legal principles and the district court ultimately reaches the same conclusion in both analyses." 742 F. App'x at 221.

25

The simple *Heller* test approaches the issue like the *Heller* Court did, determining "whether the law bans the types of [arms] commonly used for a lawful purpose." *Rhode*, 2020 WL at *16; *see Heller*, 554 U.S. at 625 (the Second Amendment protects arms "typically possessed by law-abiding citizens for lawful purposes"); *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1032 (2016) (Alito, J., concurring) ("the pertinent Second Amendment inquiry is whether [the arms in question] are commonly possessed by law-abiding citizens for lawful purposes").

The test is indeed simple: "The majority of citizens who use common ammunition do so for lawful purposes, including self-defense. Under *Heller* and *McDonald*, that is all that is needed for citizens to have a right under the Second Amendment to acquire and keep common ammunition." *Rhode*, 2020 WL at *16.

The *Caetano* concurrence confirmed this approach: "stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment." 136 S. Ct. at 1033 (Alito, J., concurring); *see also Friedman v. City of Highland Park, Ill.*, 136 S. Ct. 447, 449 (2015) (Thomas, J., joined by Scalia, J., dissenting from the

26

denial of certiorari) ("Under our precedents, that [the arms are commonly used for lawful purposes] is all that is needed for citizens to have a right under the Second Amendment to keep such weapons.").

Because the ammunition scheme operates as a complete ban on common arms for a great number of law-abiding citizens, it is unconstitutional under the simple *Heller* test. *Rhode*, 2020 WL at *16. And because the district court reached the same conclusion with both tests, there is no reversible error. *Duncan*, 742 F. App'x at 221.

## CONCLUSION

The State's background check system burdens every lawful purchaser of ammunition and has entirely prohibited tens of thousands of law-abiding citizens from acquiring ammunition and exercising a constitutional right. Yet, the State has provided no evidence that its background check system has any effect on gun violence. The plaintiffs have demonstrated that it is ineffective. The district court therefore did not abuse its discretion by granting an injunction on Second Amendment grounds. Its decision should be affirmed.

Respectfully submitted,

/s/ *Joseph G.S. Greenlee*
JOSEPH G.S. GREENLEE

FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 378-5785
jgr@fpchq.org
*Counsel of Record*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 5,311 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionately spaced Century Schoolbook font.

Dated this 7th day of August 2020.

/s/ *Joseph G.S. Greenlee*
*Counsel of Record*

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2020, I served the foregoing brief via the CM/ECF system for the United States Court of Appeals for the Ninth Circuit, which will distribute the brief to all attorneys of record in this case. No privacy redactions were necessary.

Dated this 7th day of August 2020.

/s/ *Joseph G.S. Greenlee*
*Counsel of Record*